**ROSSITER v. ELLIS.**

**Patent Appeal No. 3358.**

Court of Customs and Patent Appeals.
Dec. 24, 1934.

H. C. Bierman, of New York City, and
Chas. S. Grindle, of Washington, D. C.
(Leonard A. Watson, of New York City, of
counsel), for appellant.

Sol Shappirio, of Washington, D. C., for
appellee.

Before GRAHAM, Presiding Judge, and
BLAND, HATFIELD, GARRETT, and
LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant, Edmund C. Rossiter, filed
his application in the United States Patent
Office, serial No. 145,369, on October 30, 1926,
for patent upon a process for the manufac-
ture of artificial resins. This application
discloses a process wherein thiourea is dis-
solved in an aqueous solution of formalde-
hyde and heated to between 60 and 70 de-
grees centigrade. The specification further
discloses that such a solution remains clear
for a considerable period, but that the prop-
erties of the product obtained after drying
render the use of accelerators desirable dur-
ing the subsequent molding with heat; that
with a similar treatment, when urea is used
instead of thiourea, the mixture becomes solid
and useless for some purposes; that one ob-
ject of the invention is to obtain resins suit-
able for molding purposes which are insolu-
ble in water; and that another object is to
produce solutions which retain the properties
of the thiourea condensation product so far
as regards solubility, but "whose subsequent
condensation into the final product takes
place more readily than that of the thiourea
condensation product alone." This statement
is then made in the specification:

"If equivalents of urea are used up to a
proportion such that about 25% of the thio-
urea is replaced, clear solutions are obtained
which, on concentration, yield the resin as a
clear or nearly clear syrup.

"If, however, the thiourea is replaced to
the extent of more than 25%, then the prod-
ucts become more and more turbid, as the pro-
portion of urea is increased, which effect may
be obviated largely by the addition of a little
ammonia."

On September 3, 1924, the appellee, Carle-
ton Ellis, filed his application in the Patent
Office for a patent on certain alleged im-
provements in urea products and processes
of making the same, and which application
was renewed on April 13, 1929, as serial No.
735,600.

The Ellis application referred particular-
ly to sheets or other articles of mica, which
were formed by cementing together flakes or
particles of mica "with the aid of a resinous
product prepared from urea especially from
urea and formaldehyde or from derivatives
of urea such as thiourea and to the process of
making same."

An examination of the specification in this
application discloses that it was the object
of the inventor "to obtain a synthetic resin
which may be prepared of fairly constant
quality that will have satisfactory cementing
or binding effect." The specification dis-
closes that not all resinous phenol formalde-
hyde products have the ability to "wet" such
material, but that the solid compounds ob-
tained by the reaction of formaldehyde with
urea do have such a characteristic, and have
the further property of hardening or setting
when heated. An example of the process is
given in these words:

"As an example 30 parts by weight of
urea are dissolved in 120 parts of aqueous 40

per cent formaldehyde and 3 parts of phthalic acid or phthalic anhydride are added. As the urea dissolves in the formaldehyde solution there is a decided lowering of temperature. Then the solution begins to show signs of turbidity which change is accompanied by a gradual rise in temperature. The reaction is exothermic. The solution finally becomes milky about the time the spontaneous temperature rise has reached its maximum. In one case the temperature went from 28 to 67° C. in about 20 minutes. The reaction mixture was allowed to stand for 1 hour during which time the temperature dropped to 42° C. Heat was applied and the temperature was raised over a period of one-half hour to 76° C. and then more gradually over a period of 2 hours to 94° C. After heating for about 45 minutes the mixture began to clear but a longer heating was required to completely clarify the solution. A syrupy solution was obtained having a specific gravity of 1.151 at 25° C. the solid content of which was 44 per cent."

Further in the specification, the appellant stated, "In place of urea, mixtures of the latter and thiourea and the like may be employed in some cases or even the thiourea by itself subjecting it to appropriate treatment with formaldehyde."

On June 10, 1929, an interference was declared between said applications, the counts of this interference being five in number, they being the first five counts in the interference, as it is now before us. The appellant then moved to dissolve the interference on the grounds that Ellis could not make the counts, and that the application of Ellis did not show an operative process. The party Ellis moved to amend by adding proposed counts 6, 8, 9, 10, 11, and 12. Rossiter's motion to dissolve was supported by two affidavits which purported to show inoperativeness of Ellis' disclosure.

The Law Examiner overruled the motion to dissolve, and allowed the amendment. Thereupon Rossiter, the appellant, being the junior party, was ordered to show cause why an award of priority should not go to Ellis. Rossiter then moved that the order to show cause be vacated, and time be set for the taking of testimony on the question of Ellis' right to make certain of the claims in the issue, it being stated that it was desired to establish, by evidence, that the Ellis application did not disclose an operative process. This was a repetition in part of the said motion to dissolve which had been made by Rossiter on November 4, 1929, and which

motion had been supported by affidavits of chemists which, it is claimed by Rossiter, established a prima facie case of inoperativeness.

The Examiner of Interferences denied the motion to take testimony, which decision was reversed by the Commissioner of Patents, and testimony was duly taken.

On August 19, 1931, the party Rossiter moved to dissolve on the grounds that "a statutory bar exists against the grant of a patent to him (Ellis)." In the alternative, it was moved that the burden of proof be shifted from Rossiter to Ellis, the ground given being that the present claims of the issue relate to a different subject-matter than the subject-matter included in the original Ellis application.

The Examiner of Interferences held that the motion period had expired on November 4, 1929, and that the motion of August 19, 1933, to dissolve, was brought too late, and that the affidavits filed in support thereof were not sufficient to support the same, and denied the motion to dissolve.

On final hearing, the Examiner of Interferences held that the burden of establishing that Ellis' disclosure was inoperative was imposed upon the party Rossiter; that Rossiter had the burden of establishing and sustaining a prima facie case; and that "such case is not established if in the opinion of the examiner the disclosure is operative if the matter set out in the disclosure is modified or added to in regard to details within the non-inventive ability of one skilled in the art at the time of filing." The Examiner of Interferences, after an extended discussion, came to the conclusion that Rossiter had failed to establish the inoperativeness of Ellis' disclosure, and therefore awarded priority to the senior party Ellis.

The Board of Appeals was of opinion that counts 1, 4, 6, 7, and 9 were typical of all the counts of the interference, and discussed them at length. The Board was of the opinion that it might not consider the questions presented, but not directly passed upon, by the Examiner of Interferences. These were the questions arising out of the motion of Rossiter to dissolve, made after the motion-making time had expired. With regard to the holding as to insufficiency of disclosure and inoperativeness, the Board said:

"* * * The Examiner of Interferences, Law Examiner and Primary Examiner have all held that the disclosure is sufficient and we can see no good reason for taking a contrary position. We fail to see why it is

necessary after making a statement as above quoted that in each instance an example be given of the process with mixtures as well as individual elements of the mixture set forth. Unless there is something essentially different and unusual about the reactions with the use of urea, thiourea or the mixtures of urea and thiourea in the process, it seems superfluous to give duplicate examples for each of the elements referred to."

Following this, the Board concluded that the disclosure in the Ellis application "is a prima facie disclosure of an operative process and that appellant has failed to present proofs, satisfactory to us, to the contrary." Finally, the Board affirmed the decision of the Examiner.

The reasons for appeal filed by the appellant embrace three general subject-matters: First, that the Board was in error in finding that the party Rossiter had not established the inoperativeness of the Ellis disclosure; second, and more specifically, that the Board of Appeals was in error in refusing to hold that Ellis' application did not disclose an operative process to produce a solution containing a condensation product of urea with formaldehyde, and a condensation product of thiourea with formaldehyde, the condensation products having substantially the same degree of condensation; third, in general, that the Board was in error in not finding that Ellis was confined to the filing date of his renewal application, as the question was raised by Ellis' last motion to dissolve, and which was filed, as has been stated, after the time for filing such motions had expired.

Counts 1, 4, 6, 7, and 9 are as follows:

"1. The process for the manufacture of an improved solution for use in preparing moulding products from synthetic resin which consists in causing the intermixing in solution of a condensation product of thiourea and formaldehyde with a condensation product of urea and formaldehyde, the condensation products being of substantially the same degree of condensation.

"4. A solution for use in preparing moulding products from synthetic resin, the solution containing in a dissolved state a condensation product of thiourea and formaldehyde and a condensation product of urea and formaldehyde, the condensation products being of substantially the same degree of condensation.

"6. A resinous complex containing the condensation products of formaldehyde with urea and a formaldehyde with thiourea, the condensation products being of substantially the same degree of condensation.

"7. The method of making a resinous complex which comprises interacting formaldehyde with urea and formaldehyde with thiourea to produce a condensation product of each of the ingredients specified, the condensation products being of substantially the same degree of condensation.

"9. The process for the manufacture of an improved solution for use in preparing molding products from synthetic resin which consists in dissolving urea and thiourea in formaldehyde without heating the solution to the boiling point for any substantial period of time."

In order that the issues may be more precisely defined, attention will be given to the appellant's last motion to dissolve, filed August 19, 1931, and which was filed after the period for filing motions had expired. This motion was based upon the contention that the appellee was claiming in his renewal application herein involved a different invention than that claimed in his original application. As a reason for not raising this point within the appointed period, the appellant filed affidavits by which it is shown that counsel had just been advised of the holding of this court in Re Kaisling, 44 F.(2d) 863, 18 C. C. P. A. (Patents) 740, in which this subject was discussed.

We are unable to conclude that Rossiter has made any showing sufficient to excuse his failure to file this motion to dissolve during the motion period, in conformance with rules 130 and 122 of the office. The concluding language of rule 122 is significant:

"* * * If in the opinion of the examiner of interferences the motion be not in proper form, or if it be not brought within the time specified and no satisfactory reason be given for the delay, it will not be considered and the parties will be so notified."

The mere fact that this court, in Re Kaisling, supra, may have construed section 4897 Rev. St. (35 USCA § 38), did not change the rule or the law.

The Examiner of Interferences refused to pass upon the matters raised by this motion, and the Board of Appeals affirmed this holding. We are of opinion there was no reversible error in such holdings. "It is familiar law that a party challenging the right of his opponent to make the contested claims must do so at the inception of the proceeding by motion to dissolve the interference." Rocke v. Bogdonoff, 56 App. D. C. 140, 10 F.(2d) 1005, 1006.

458

This is not such a question as was thought by the majority of the court in Sundstrand v. Gubelmann, 55 App. D. C. 200, 4 F.(2d) 166, to be a jurisdictional one which could be first raised on appeal.

This holding disposes of the claims of the appellant described in the following language by the Board of Appeals:

"Other grounds of appeal are that the Examiner of Interferences erred in failing to hold that Ellis is barred from obtaining a patent for the subject matter in issue on his renewal application involved in the interferences because under Section 4897, R. S. [35 USCA § 38] such subject matter is not the same invention as was claimed in the original Ellis application before and at the time the same was originally allowed. It is also urged that the Examiner of Interferences erred in failing to hold on the record that Ellis is not entitled to any date of reduction to practice, constructive or otherwise, before April 13, 1929, the renewal date of his application, Serial No. 735,600, involved in this interference. As another ground it is stated that the Examiner of Interferences erred in failing to hold that the Rossiter British Patent No. 266,028, which is alleged to be patented and received in this country more than two years before Ellis renewed his application, constitutes a statutory bar against Ellis under section 4886, R. S. [35 USCA § 31].

"As to these latter grounds for appeal, the Examiner of Interferences refused to consider them inasmuch as they were raised after the motion period had terminated and no sufficient reason given for delay in presenting the motion. It is a well recognized practice in this office that matters not considered by the tribunal of original jurisdiction will not ordinarily be reviewed on appeal. * * * *"

■ This leaves for consideration the questions presented by appellant's motion to dissolve filed November 4, 1929. Five specific grounds are therein urged, as follows:

First. That Ellis is entitled to no claims that do not include phthalic acid or its equivalent, because of the limitations of the prior art; that the "prior art shows it to be old to heat together urea or thiourea with formaldehyde until condensation takes place, and the only difference between the prior art and the Ellis disclosure, so far as production of a resin solution is concerned, is that Ellis includes phthalic anhydride in his procedure."

Second. That Ellis has stated in his specification that thiourea and mixtures of thiourea and urea are the equivalent of the urea in his specific example, and that Ellis has failed to prove this to be true, and that, in fact, it is not true.

Third. That the counts are limited to a solution of the reaction product of urea, thiourea, and formaldehyde; that Ellis' disclosure, including phthalic anhydride, does not satisfy these counts.

Fourth. That Ellis' application does not disclose a procedure which is operative to produce a resin solution as specified in the counts of the issue.

Fifth. That Ellis' application does not disclose a procedure which would be operative to produce a solution such as defined by the counts of the issue, as shown by experiments and by the affidavits of Barsky and Wohnseidler, but will produce only a "heavy flocculent precipitate."

As to the first ground above alleged, the Law Examiner, in his decision of June 19, 1930, held adversely to the party Rossiter and that specific ground does not again appear of record, nor is it urged as a reason for appeal here. As a matter of fact, the appellant makes no insistence here that Ellis' claims are not patentable.

As to the second and third grounds of said motion, we find ourselves in harmony with the decision of the Law Examiner, where, in discussing these points, he says:

"Ellis states that his invention relates to sheets or other articles of mica formed by cementing together flakes or particles of mica with the aid of a resinous product prepared from urea and formaldehyde or from derivatives of urea such as thiourea and to the process of making the same. He states that the solid compounds obtained by the reaction of formaldehyde with urea have the property of adhering to mica and are therefore useful in making sheets from mica splittings. A formula for making a solution is given in which urea, formaldehyde and phthalic acid or phthalic anhydride are used. He states 'in place of urea, mixtures of the latter and thiourea and the like may be employed in some cases or even the thiourea by itself subjecting it to appropriate treatment with formaldehyde.' Ellis' claims first presented covered articles made from mica flakes or sheets cemented together with urea or urea formaldehyde resin and processes of making composite sheets in which a cementing solution of 'urea formaldehyde resin' was used.

"Count 3 is the broadest of the group and comprises the single step of simultaneously dissolving urea and thiourea in formaldehyde.

It is considered that Ellis has sufficient a disclosure to support this count in his statement that mixtures of urea and thiourea may be used, obviously by dissolving in formaldehyde. It is not necessary that Ellis should show he appreciated that the thiourea had an accelerating action on the urea which action is alleged by Rossiter, so long as he appreciated it would produce a solution that would adhere to mica, as evidently he did. Nor should he be confined to the addition of phthalic or other organic catalyst such as phthalic acid and that in other cases an alkaline catalyst such as ammonia may be employed but that his invention contemplates the use of urea resin whether made in acid, alkaline or neutral solution. The neutral solution obviously would exclude phthalic acid."

The controversial question, therefore, arises upon the operability of Ellis' disclosure.

Both parties took testimony on this question. A series of ex parte and inter partes experiments were conducted and the results include certain physical exhibits, and also a very considerable volume of testimony. As we agree with the conclusions of the Board of Appeals, it seems unnecessary to comment at length upon this testimony. A few suggestions, however, are pertinent. Counts 1, 2, 3, 7, 9, and 11 are for a process, while counts 4, 5, 6, 8, and 10 are for a product. It will also be observed that the first five counts and count 9 of the interference are for a "solution" or process for making the same. The other counts are for "a resinous complex" or synthetic resin, or method of making the same.

The general impression created upon the mind by reading the record is that, in conducting the experiments, the witnesses for the party Rossiter were not so much endeavoring to completely test out the operativeness of Ellis' disclosure as to establish the fact that it was not operative. The facts in the record show plainly that urea and thiourea products are extremely sensitive products and that the least alteration of methods of manufacture may, and usually does, produce great changes in the products, ranging all the way from syrupy solutions to flocculent, useless products. Variation in degrees of heat, length of heating, the time of adding, and character of, catalysts or agents such as phthalic anhydride, all effect marked changes in the product.

The appellant insists that the following of Ellis' one example will not produce a syrupy solution, and hence is not operative. This contention is based upon the fact that Ellis recites, in his example, that he obtained "a syrupy solution," after certain processes. As said by the Board:

"We note that counts 1–5, inclusive, and 9 are the only counts which refer to a solution, and not necessarily a syrupy solution. We also note that there is nothing to indicate in the counts that a permanent solution is obtained in which the resins or resinous complexes exist in permanently soluble form and in which no further conversion to the insoluble form can gradually take place. In fact the counts might be construed to cover soluble resinous complexes which are not completely in solution at ordinary temperatures but will redissolve on heating. It therefore should be proven on behalf of Rossiter that a solution cannot be obtained at any time following the disclosure of the Ellis application."

We agree with these suggestions of the Board.

Furthermore, as we read the record, syrupy solutions were obtained in some of the Rossiter experiments, as well as in those of Slaughter, a witness for the appellee. Practically all the experiments showed a syrupy solution at some time during the experiments. This solution, it was testified, changed, in some cases, into a solid sedimentary deposit, the exact character and nature of which is not clearly shown by the record. What would have happened if the process had been stopped while the materials were in solution, also does not appear. On the whole, there is no preponderating proof that the disclosure of Ellis is inoperative.

The samples of the results obtained, and which are before the court, are of little or no evidentiary value, as it plainly appears of record that such products are not stable and are apt to change from time to time. Furthermore, it is, to say the least, doubtful whether those who conducted the tests on the part of the party Rossiter followed the method disclosed by Ellis, in the time and manner of adding phthalic acid or phthalic anhydride. Obviously, Ellis, in his typical example, intended that this element be added after the urea or thiourea had been dissolved in the formaldehyde.

It is contended by counsel for appellant that certain counts of the interference should be so construed as to cover a process in which a condensation product of urea and formaldehyde was first produced, then, separately, a condensation product of thiourea and formaldehyde, and then a mixing of these resulting

condensation products. The counts of the interference, however, are not thus confined, but are broad enough to cover a simultaneous mixing of urea, thiourea, and formaldehyde. As remarked by the Board of Appeals, the one example given by Rossiter discloses just such a simultaneous admixture. It is:

"The invention is illustrated in the following example:

"95 lbs. of thiourea and 74 lbs. of urea are dissolved in 271 lbs. of formalin containing 120 lbs. of formaldehyde; the mixture is warmed to 50°–70° C. until all the thiourea and urea has dissolved. A turbid solution is obtained which after remaining a few hours to allow the condensation to take place is evaporated at 70°–80° C. by blowing a brisk current of air through it, until the solution of the condensation product is sufficiently concentrated or until all adhering water is evaporated."

Appellant contends that count 9 will not read on appellee's disclosure, because of the fact that this count provides that the solution may not be heated to the boiling point for any "substantial period of time," and that Ellis does so heat his solution. The Law Examiner points out, we think properly, that this count only limits such heating to the period when the dissolving of the products is occurring. Ellis' one example shows that, during this period, the temperature of the mixture does not rise above 67 degrees centigrade.

We find no error in the decision of the Board of Appeals and it is affirmed.

We have examined those portions of the record brought here by certiorari, after suggestion of a diminution of the record, by appellee. Of these, papers 1 and 2, the preliminary statements of the parties, and paper 106, a supplemental decision by the Board of Appeals, should have been included in the record, and the costs of printing these items are taxed against the appellant. Papers 68, 79, and 88, relating to a motion to suppress and a motion to strike, are not involved in the issues on appeal here, and the costs for printing the same will be taxed to the appellee.

Affirmed.